139 Nev., Advance Opinion 44

IN THE COURT OF APPEALS OF THE STATE OF NEVADA

| | |
|---|---|
| PARVIZ EIVAZI,<br>Appellant,<br>vs.<br>FATEMEH EIVAZI,<br>Respondent. | No. 84427-COA<br><br>FILED<br><br>OCT 05 2023<br><br>ELIZABETH A. BROWN<br>CLERK OF SUPREME COURT<br>BY_____<br>CHIEF DEPUTY CLERK |

Appeal from a district court decree of divorce. Eighth Judicial District Court, Family Division, Clark County; Nancy Saitta, Sr. Judge.[1]

*Affirmed in part, reversed in part, and remanded.*

Hofland & Tomsheck and Bradley J. Hofland, Las Vegas,
for Appellant.

Radford J. Smith, Chartered, and Garima Jain and Radford J. Smith, Henderson,
for Respondent.

_____

BEFORE THE COURT OF APPEALS, GIBBONS, C.J., and BULLA and WESTBROOK, JJ.

*OPINION*

By the Court, WESTBROOK, J.:

In this opinion, we take the opportunity to caution both practitioners and district courts of the dangers inherent in the practice of

_____

[1]District Court Judge Nadin Cutter is now assigned to the case.

23-32631

adopting wholesale a litigant's proposed findings of fact and conclusions of law. In this case, following lengthy divorce proceedings, the district court summarily adopted respondent Fatemeh Eivazi's proposed 61-page findings of fact, conclusions of law, and decree of divorce as drafted, without making any modifications. Appellant Parviz Eivazi contends that it was reversible error for the district court to do so. We conclude that utilizing a party's proposed order does not in and of itself constitute an abuse of discretion, as the practice of requesting and adopting proposed orders from the parties is both well established and often necessary to the administration of justice. Nevertheless, we strongly urge both litigants and judges to exercise care when preparing and adopting such orders.

Practitioners should ensure that proposed orders are both factually accurate and legally adequate, and courts should diligently exercise their discretion and thoroughly review litigant-drafted orders before adopting them. In this case, while portions of the decree are legally and factually supportable, other parts contain numerous legal and factual deficiencies. With respect to the latter, we conclude that the district court abused its discretion when it granted financial awards for alimony, attorney fees, and expert fees and when it unequally distributed the parties' community property and debt. Accordingly, we affirm in part, reverse in part, and remand this matter to the district court for further proceedings consistent with this opinion.

### FACTS AND PROCEDURAL HISTORY

Although previously married in Iran, Parviz and Fatemeh moved to the United States and were married in Las Vegas in 2001.

Fatemeh filed for divorce in June 2016.[2] From the inception of the case, the divorce proceedings were drawn out and highly contested. In the first year alone, both parties filed multiple motions and countermotions, requesting attorney fees and costs in connection with those filings. The district court entered numerous orders granting and denying the parties' various requests for attorney fees and costs, and Fatemeh did not move to reconsider any of these orders.

In April 2017, Parviz filed a motion for summary judgment related to the parties' marriage in Iran and again requested attorney fees and costs. Fatemeh opposed the motion and also sought attorney fees and costs in connection with that motion under EDCR 7.60(b) and NRS 18.010(2)(b), on grounds that Parviz had multiplied the proceedings in a manner that increased costs unreasonably and vexatiously and because his motion was maintained without reasonable grounds or to harass. Because there were genuine disputes of material fact, the district court denied Parviz's motion for summary judgment but scheduled an evidentiary hearing to resolve three discrete issues. The court deferred the parties' pending motions for attorney fees and costs until that time.

The pretrial evidentiary hearing was held over a three-day period in October 2017, May 2018, and June 2018. Following this hearing, the district court entered a minute order in November 2018, ruling in favor of Fatemeh on all three issues, providing that the parties "would bear their own fees and costs," and directing Fatemeh to prepare the order. A year

---

[2]After the initiation of divorce proceedings, Parviz filed for Chapter 13 bankruptcy. Prior to the entry of the divorce decree, Parviz's debt was reduced from approximately $187,000 to $65,000, and Parviz was making monthly payments towards the principal amount.

later, Fatemeh still had not prepared the order. So, in November 2019, Parviz prepared an order that was filed by the district court. After Parviz served Fatemeh with a copy of the order, Fatemeh filed a notice of entry of order in December 2019. On the same day, she moved for reconsideration of that order.

In her motion for reconsideration, Fatemeh argued she was entitled to all attorney fees from the inception of the case through the evidentiary hearing—not just the fees that related to the summary judgment motion and evidentiary hearing that the district court had denied in its December 2019 order. In the motion, Fatemeh also requested reconsideration as to expert fees, but she did not seek reconsideration as to costs. The district court granted Fatemeh's motion for reconsideration and set the case for trial.[3]

A divorce trial was held over three days in June, July, and August 2020 to address the parties' remaining contested issues. During the trial, Fatemeh alleged that Parviz had wasted a substantial amount of community funds and presented an expert forensic accountant who identified potential waste. Analyzing financial transactions from 2011 to 2017, Fatemeh's expert determined that a variety of "unknown or unsupported transactions" constituted potential marital waste in the aggregate amount of $208,294. Fatemeh posited that these transactions were waste because she had no knowledge of them and did not consent to the depletion of the community funds. When asked about the expenditures at trial, Parviz testified that the funds were used for marital expenses

---

[3]Although the district court granted Fatemeh's motion for reconsideration, it did not enter an order formally awarding Fatemeh her requested fees until the entry of the divorce decree.

including education, travel, jewelry for Fatemeh, fertility treatments, home improvements, a down payment on a new home, and cash given directly to Fatemeh.

Fatemeh and Parviz each also testified about their respective employment status. Fatemeh was previously employed full time as an ultrasound technician, but she suffered injuries during a car accident in 2018. Following her accident, Fatemeh initially worked part time, but in 2019 she ceased employment completely due to her physical limitations. Parviz was employed full time as a scientist with the Las Vegas Valley Water District. During the trial, however, Parviz testified that he had several health problems and that he was currently using his accrued sick days pending his request for FMLA leave.

At the conclusion of the trial, the district court asked both parties to submit proposed orders. They complied, and in February 2021, the district court entered Fatemeh's 61-page proposed findings of fact, conclusions of law, and decree of divorce in its entirety, without modification. Although the decree noted that neither party had significant assets, the decree awarded Fatemeh $5,000 per month in alimony for ten years, $176,976.99 in attorney fees and costs from the inception of the case through the pretrial evidentiary hearing, and $19,565 in expert fees. The decree ordered Parviz to reimburse Fatemeh $59,000 for monies she used "to fund the litigation." The decree also made an unequal distribution of community property and debt, requiring Parviz to reimburse Fatemeh for half of the wasted community assets in the amount of $100,357.50 and ordering Parviz to pay half of Fatemeh's credit card debt while Parviz remained solely responsible for his bankruptcy debt. In total, the decree required Parviz to pay Fatemeh more than $400,000. In addition, the

decree ordered Parviz to sell the marital home. Lastly, the decree provided that any unpaid balance would be reduced to judgment and accrue interest.

After entry of the decree, both Fatemeh and Parviz filed motions to amend the decree. The district court denied Parviz's motion but granted Fatemeh's motion in part and ordered that Fatemeh would also receive nearly the entire value of Parviz's retirement account, which the decree had previously split evenly between them, to satisfy the financial obligations that remained after the sale of the marital home.[4] Parviz timely appealed.

*ANALYSIS*

In this appeal, we address the following issues: (1) whether the district court abused its discretion when it adopted Fatemeh's proposed decree verbatim in its entirety; (2) whether the district court abused its discretion when it found marital waste because Parviz was unable to account for unknown transactions by clear and convincing evidence; (3) whether the district court adequately considered the alimony factors in NRS 125.150(9), including Fatemeh's need for alimony and Parviz's ability to pay, when it awarded Fatemeh alimony of $5,000 per month for ten years; (4) whether the district court abused its discretion when it awarded Fatemeh attorney fees from the inception of litigation through the evidentiary hearing, $59,000 to reimburse her for money she borrowed to fund the litigation, and expert fees; and (5) whether the district court abused its discretion in connection with other miscellaneous financial awards and allocations in the divorce decree.

---

[4]On appeal, Parviz does not challenge any of the district court's rulings on the parties' post-decree motions, including the court's redistribution of his retirement account.

This court reviews a district court's alimony determinations, attorney fee awards, and disposition of community property, including any underlying marital waste determinations, for an abuse of discretion. *Kogod v. Cioffi-Kogod*, 135 Nev. 64, 75, 439 P.3d 397, 406 (2019). This court reviews the district court's factual findings deferentially and will not set them aside unless they are clearly erroneous or unsupported by substantial evidence. *Ogawa v. Ogawa*, 125 Nev. 660, 668, 221 P.3d 699, 704 (2009). Substantial evidence "is evidence that a reasonable person may accept as adequate to sustain a judgment." *Ellis v. Carucci*, 123 Nev. 145, 149, 161 P.3d 239, 242 (2007).

"Although this court reviews a district court's discretionary determinations deferentially, deference is not owed to legal error" or findings so conclusory that they mask legal error. *Davis v. Ewalefo*, 131 Nev. 445, 450, 352 P.3d 1139, 1142 (2015). The district court "must have reached its conclusions for the appropriate reasons," *Ellis*, 123 Nev. at 149, 161 P.3d at 241-42, and if there are no facts explaining how the district court reached its conclusions, this court cannot determine whether those conclusions were made for appropriate reasons, *see Davis*, 131 Nev. at 451-52, 352 P.3d at 1143 (explaining that, because the district court did not tie its factual findings to its conclusion, the appellate court "cannot say with assurance that the . . . determination was made for appropriate legal reasons").

*Adopting Fatemeh's proposed decree verbatim was not, by itself, an abuse of discretion*

Parviz initially contends that the divorce decree must be set aside because the district court accepted Fatemeh's proposed decree in its entirety, without making any modifications. Parviz argues that, by doing so, the district court abdicated its judicial role and, necessarily, abused its

discretion. We disagree that a district court abuses its discretion simply by entering an order proposed by one of the litigants without modification; however, we caution courts and practitioners alike that there are risks inherent in this practice, and scrutiny should be given to the contents of any proposed orders before entering them. *See Fed. Nat'l Mortg. Ass'n v. Westland Liberty Vill., LLC*, 138 Nev., Adv. Op. 57, 515 P.3d 329, 337 n.6 (2022) (urging district courts "to scrutinize [proposed] draft orders, being mindful that they assume responsibility for those findings and attendant rulings upon entry of the order").

At the outset, we note that in the Eighth Judicial District Court's Family Division, the court rules expressly contemplate that parties may submit proposed orders for consideration and adoption by the court. *See* EDCR 5.515 ("Proposed orders may include such findings, conclusions, and orders as the submitting party believes relevant to each point in dispute in the proceedings."). Moreover, the Nevada Supreme Court has recognized that a district court may properly adopt a party's proposed order, provided that the opposing party is apprised of the order and given an opportunity to respond. *See Byford v. State*, 123 Nev. 67, 69, 156 P.3d 691, 692 (2007) (discussing the predecessor to Nevada Code of Judicial Conduct (NCJC) Cannon 2, Rule 2.6(a), which was substantively identical to the present rule).[5]

---

[5]Although NCJC Cannon 2, Rule 2.6(a) does not include the commentary from the former version of the rule that was discussed in *Byford*, the decision's rationale remains equally applicable today given that the current rule still requires the district court to "accord to every person who has a legal interest in a proceeding, or that person's lawyer, the right to be heard according to the law."

Parviz does not argue on appeal that he did not have an opportunity to respond to Fatemeh's proposed decree prior to the district court's adoption. In fact, the record reflects that both parties timely emailed their proposed decrees to the court and copied opposing counsel on those emails, at which point either party could have raised objections thereto. Further, after entry of the decree, Parviz had an opportunity, under NRCP 52(b), to request amendments to the decree. *See* NRCP 52(b) ("On a party's motion . . . the court may amend its findings—or make additional findings—and may amend the judgment accordingly."); *cf. Byford*, 123 Nev. at 70, 156 P.3d at 693. The availability of this procedure offers an additional level of protection to litigants in the event that they believe the district court's findings and conclusions are improper. In this case, Parviz availed himself of that opportunity by filing a motion to amend the decree.

Nevertheless, Parviz contends that the district court erred by adopting Fatemeh's proposed order verbatim based on several cases that have criticized the practice of district courts adopting litigant-drafted orders. *See, e.g., Anderson v. Bessemer City*, 470 U.S. 564, 572 (1985) (stating that "[w]e, too, have criticized courts for their verbatim adoption of findings of fact prepared by prevailing parties" and noting "the potential for overreaching and exaggeration on the part of attorneys preparing findings of fact"); *In re Colony Square Co.*, 819 F.2d 272, 275 (11th Cir. 1987) ("The dangers inherent in litigants ghostwriting opinions are readily apparent."); *Chudasama v. Mazda Motor Corp.*, 123 F.3d 1353, 1373 n.46 (11th Cir. 1997) (explaining that "[w]e have consistently frowned upon the practice of delegating the tasks of drafting important opinions to litigants," as the "practice harms the quality of the district court's deliberative process"); *Harris v. Davis*, 88 N.E.3d 1081, 1086 n.2 (Ind. Ct. App. 2017) (stating that

"[w]hen a trial court adopts verbatim a party's proposed findings and conclusions," it "weakens our confidence as an appellate court that the findings are the result of considered judgment by the trial court" (internal quotation marks omitted)).

Although these cases strongly discourage the practice of adopting litigant-drafted orders verbatim, they do not support Parviz's argument that the practice is itself an independent basis for reversal. For instance, in *Anderson*, the United States Supreme Court explained that "even when the trial judge adopts proposed findings verbatim, the findings are those of the court and may be reversed only if clearly erroneous." 470 U.S. at 572. The Supreme Court declined to subject the district court's findings to a more stringent appellate review than called for by the applicable rules. *Id.* at 572-73. Likewise, in *In re Colony Square*, the United States Court of Appeals for the Eleventh Circuit explained that "[t]he fact that a judge allowed a litigant to draft the court's orders without notice to the opposing party" did not automatically invalidate those orders absent a finding that the opposing party was denied a meaningful opportunity to be heard. 819 F.2d at 276-77. In *Saylor v. State*, also cited by Parviz, the Indiana Supreme Court concluded that "although we do not encourage . . . judges to adopt wholesale the findings and conclusions of either party, we decline to find bias solely on that basis. The critical inquiry is whether the findings adopted by the court are clearly erroneous." 765 N.E.2d 535, 565 (Ind. 2002), *rev'd on reh'g on other grounds*, 808 N.E.2d 646 (Ind. 2004); *see also Harris*, 88 N.E.3d at 1086 n.2 (stating that when a trial court adopts a party's proposed order without modification, "it does not alter our standard of review"); *Chudasama*, 123 F.3d at 1373 n.46 (recognizing "that the district court's adoption of [a party's] draft orders nearly verbatim

does not affect our standard of review" and also "does not automatically create an appearance of impropriety that would require the district court judge to recuse" (internal quotation marks omitted)).

Caselaw from the Nevada Supreme Court also undermines Parviz's argument. In *Foley v. Morse & Mowbray*, the appellant made a similar argument challenging a district court's adoption of a proposed order "without any changes." 109 Nev. 116, 123, 848 P.2d 519, 524 (1993). The supreme court evaluated the *substance* of the district court's order for potential error. The court identified errors as to certain findings of fact and conclusions of law because those particular findings were not supported by the record, but the court approved the remainder of the district court's order. *Id.* at 124, 848 P.2d at 524. Thus, in analyzing the *contents* of the district court's order, the supreme court implicitly rejected the appellant's claim that adopting the respondent's proposed order "without any changes" was itself error. *Id.* at 123-24, 848 P.2d at 524.

As noted above, we recognize that numerous authorities have criticized, discouraged, and condemned the practice of courts adopting verbatim orders and findings of fact prepared by prevailing parties. *See, e.g., Anderson*, 470 U.S. at 571. We, too, share these concerns. *See Fed. Nat'l Mortg. Ass'n*, 515 P.3d at 337 n.6. Nonetheless, we also recognize that asking litigants to submit proposed orders is a customary practice that is often necessary for the timely administration of justice. *See, e.g., Prowell v. State*, 741 N.E.2d 704, 708-09 (Ind. 2001) (providing that courts may adopt a proposed party's findings because "trial courts of this state are faced with an enormous volume of cases" and "the need to keep the docket moving is properly a high priority of our trial bench"). Further, NRCP 52(b) protects parties by providing the opportunity to object to and amend such findings,

and Parviz did in fact avail himself of that opportunity. *See Foley*, 109 Nev. at 123-24, 848 P.2d at 524 (citing *Foster v. Bank of Am.*, 77 Nev. 365, 365 P.2d 313 (1961)). Therefore, although a district court's verbatim adoption of a litigant's entire proposed order is not recommended as sound judicial practice, we cannot conclude under these circumstances that doing so is, in and of itself, an abuse of discretion. Rather, as in *Foley*, we will analyze the content and substance of the proposed order that was adopted by the district court and decide whether any particular findings of fact and conclusions of law were unsupported by substantial evidence or legally erroneous. *Ogawa*, 125 Nev. at 668, 672, 221 P.3d at 704, 707.

Although the district court did not abuse its discretion by adopting Fatemeh's proposed decree verbatim, when it did so, the court and the practitioners assumed the risk that any legal or factual errors contained in that decree might be reversible. *Fed. Nat'l Mortg. Ass'n*, 515 P.3d at 337 n.6. And in this case, Fatemeh's proposed decree contained several legal and factual deficiencies, particularly in relation to the monetary awards and allocations, which we address in turn.

*The district court abused its discretion in finding marital waste*

In its decree, the district court made an unequal disposition of community property in favor of Fatemeh in the amount of $100,357.50 to account for marital waste. Parviz challenges this disposition on multiple grounds. He alleges the district court abused its discretion when it failed to distinguish between waste and discretionary expenditures, applied an erroneous legal standard that negligent expenditures of community funds constituted waste, and imposed an improper burden on him to prove that all expenditures made during the marriage without Fatemeh's knowledge were not waste.

A district court must make an equal disposition of community property in a divorce unless there is a "compelling reason" to make an unequal disposition. NRS 125.150(1)(b); *see also Kogod*, 135 Nev. at 75, 439 P.3d at 406. "Dissipation," also known as "waste," can constitute a compelling reason for an unequal disposition of community property. *Kogod*, 135 Nev. at 75, 439 P.3d at 406; *see also Lofgren v. Lofgren*, 112 Nev. 1282, 1283, 926 P.2d 296, 297 (1996) ("[I]f community property is lost, expended or destroyed through the intentional misconduct of one spouse, the court may consider such misconduct as a compelling reason for making an unequal disposition of community property and may appropriately augment the other spouse's share of the remaining community property."). "Generally, the dissipation [or waste] which a court may consider refers to one spouse's use of marital property for a selfish purpose unrelated to the marriage in contemplation of divorce or at a time when the marriage is in serious jeopardy or is undergoing an irretrievable breakdown." *Kogod*, 135 Nev. at 75-76, 439 P.3d at 406-07 (quoting 24 Am. Jur. 2d *Divorce and Separation* § 524 (2018)); *see also Dissipation, Black's Law Dictionary* (11th ed. 2019) (defining "dissipation" as "[t]he use of an asset for an illegal or inequitable purpose, such as a spouse's use of community property for personal benefit when a divorce is imminent").

In *Kogod*, the supreme court analyzed various types of expenditures to determine if they constituted dissipation or waste. Initially, the court pointed out that when community property is spent on extramarital affairs, those expenditures will almost always constitute waste. *Kogod*, 135 Nev. at 76, 439 P.3d at 407. Such expenditures are waste, regardless of when they occur, because the act of engaging in an extramarital affair is inherently inimical to the marital relationship. As a

result, *Kogod* upheld an unequal disposition of community property in the amount that a husband spent on extramarital affairs throughout the marriage. *Id.*

In contrast, when community property is spent on gifts to family members, such expenditures do not necessarily constitute waste because supporting one's family does not inherently undermine the marital relationship. Whether gifts to family members constitute waste ultimately depends on the timing and circumstances of those gifts. In *Kogod*, the supreme court explained that "[a]bsent a specific injunction, a gift to a family member is not [waste] if there is an established pattern or history of giving such gifts to family members during the marriage." *Id.* at 77, 439 P.3d at 407. On the other hand, a gift to a family member *could* constitute waste if there was "no previous history of gift giving or the amount of the gift during the divorce [was] substantially greater than past gifts." *Id.* at 77, 439 P.3d at 408. Accordingly, the supreme court agreed with the district court that a husband's "long-standing and regular" expenditures on his family were not waste because he "routinely gave money to his family throughout the marriage, and often did so without consulting" his wife. *Id.* In contrast, the supreme court also agreed that the husband's post-separation payments that occurred *after* a joint preliminary injunction, which were neither regular nor routine, were properly characterized as waste. *Id.*

*Kogod* also recognized that waste committed after separation or during an irreconcilable breakdown of the marriage is distinguishable from overconsumption during the marriage. *Id.* at 78-79, 439 P.3d at 408-09; *see Putterman v. Putterman*, 113 Nev. 606, 609, 939 P.2d 1047, 1048 (1997) ("It should be kept in mind that the secreting or wasting of community assets

while divorce proceedings are pending is to be distinguished from undercontributing or overconsuming of community assets during the marriage."). Thus, the court instructed district courts to "differentiate between ordinary consumption for higher-income earners . . . which is not necessarily dissipation, and misappropriation of community assets solely for personal gain." *Kogod*, 135 Nev. at 78, 439 P.3d at 408.

Unlike the wasted funds spent on the husband's extramarital affairs, which were inherently adverse to the marriage, *Kogod* concluded that the district court erroneously found waste when the husband could not prove that unexplained expenditures *affirmatively* served a marital purpose. *Id.* at 78-79, 439 P.3d at 408-09. After the wife's forensic expert examined the parties' finances and identified millions of dollars in unknown transactions, or "potential community waste," the district court required the husband to account for each of the transactions and demonstrate that those transactions were *not* waste. *Id.* at 78, 439 P.3d at 408. When the husband was unable to do so, the district court made an unequal disposition of community property to the wife, in the amount of more than $2 million, to account for the potential community waste. *Id.* at 78-79, 439 P.3d at 408-09.

The supreme court deemed this to be error and reversed the district court's unequal disposition of community property that related to this purported waste. *Id.* In doing so, the supreme court noted that the district court did not require the husband "to account for these expenditures because [his wife] raised a reasonable inference that the transactions furthered a purpose inimical to the marriage, that he made them to diminish [his wife's] community share, or even that they were unusually large withdrawals from community accounts." *Id.* at 78, 439 P.3d at 408.

Rather, the district court required the husband to prove that the expenditures were not waste "because they exceeded [the husband's] self-described monthly expenses" and he failed to provide his own forensic accounting after promising to do so. *Id.* Thus, the supreme court concluded that the husband's inability to account for unknown expenses did not demonstrate a compelling reason for an unequal disposition of community assets. *Id.* at 409, 439 P.3d at 79.

Just like in *Kogod*, in this case Fatemeh presented an expert forensic accountant at trial who identified potential marital waste in the form of unknown transactions. Although Fatemeh did not file for divorce until June 2016, her expert analyzed financial transactions from 2011 to 2017 and determined that a variety of "unknown or unsupported transactions" constituted potential waste in the amount of $208,294.[6] At trial, Fatemeh testified that she believed Parviz used community funds to purchase a condominium in Iran for his mother, but the district court did not make any findings as to whether he, in fact, did so, or whether any particular transaction reflected such a purchase. Rather, the district court simply listed in the decree four categories of potential waste identified by Fatemeh's expert, including (1) "[u]nknown checks" in the amount of $53,438 between April 2011 and July 2017; (2) "[c]ash" in the amount of $120,865 between October 2013 and July 2016; (3) a transfer to "someone by the name of 'Yousfi'" in the amount of $10,000 in December 2013; and (4) "[u]nknown withdrawals" of cash in the amount of $16,412 from 2010 through 2014. The district court determined that Fatemeh demonstrated a prima facie case for "breach of fiduciary duty in the form of community

___

[6]The decree identified waste in the amount of $200,715. The reason for the discrepancy between the expert report and the decree is unclear.

waste," ostensibly because Fatemeh did not know how these funds were spent and therefore did not consent to the expenditures. And the court determined that Parviz "failed to meet his burden of proof by the 'clear and convincing' standard to explain the waste identified by Fatemeh and he failed to provide any independent accounting of that waste."

When asked about the expenditures at trial, Parviz testified that the funds were used for various marital expenses. However, the district court found that Parviz's testimony "d[id] not explain" the waste and concluded that, because he failed to account for the missing funds, all of the unknown expenditures constituted marital waste. Ultimately, the court ordered Parviz to reimburse Fatemeh for one half of this "waste" by making an unequal disposition of community property in Fatemeh's favor in the amount of $100,357.50. This was an abuse of discretion.

Because the district court's waste analysis included expenditures that were made during the six-year period *before* Fatemeh filed for divorce, the parties' briefing addresses the theoretical issue of whether waste can occur at any time during a marriage, or whether waste can occur *only after* a marriage has undergone an irretrievable breakdown. *Kogod* did not squarely address that question, and we need not resolve it here, because we conclude that regardless of *when* the alleged waste may have occurred, the district court made the very same error that the supreme court deemed reversible in *Kogod*—"requiring [Parviz] to explain everyday expenditures over the course of several years, including before this divorce

action began, and finding [waste] when he failed in this task." 135 Nev. at 78, 439 P.3d at 408.[7]

Like in *Kogod*, the district court erred by placing an evidentiary burden on Parviz to demonstrate the *absence of waste* by clear and convincing evidence[8] without first requiring Fatemeh to raise a reasonable inference that any transactions were, in fact, waste. The district court appears to have found that Fatemeh established a prima facie showing of waste simply because she was unaware of the expenditures at the time they were made and could not have consented to them, and thus Parviz had a fiduciary duty to account for all of them. To support this conclusion, the district court stated that "the negligent or willful dissipation of community funds by one of the spouses, or the surreptitious and personal use of

---

[7]Insofar as Fatemeh argues on appeal that we should reach a decision contrary to *Kogod*, this court cannot overrule Nevada Supreme Court precedent. *See Hubbard v. United States*, 514 U.S. 695, 720 (1995) (Rehnquist, C.J., dissenting) (noting that stare decisis "applies *a fortiori* to enjoin lower courts to follow the decision of a higher court"); *People v. Solórzano*, 63 Cal. Rptr. 3d 659, 664 (2007) ("The Court of Appeal must follow, and has no authority to overrule, the decisions of the [state supreme court]." (internal quotation marks omitted)).

[8]As we explained in *Monahan v. Hogan*, 138 Nev. 58, 69, 507 P.3d 588, 597 (Ct. App. 2022), "preponderance of the evidence is still the default evidentiary standard in family law absent clear legislative intent to the contrary." (Citation omitted.) Fatemeh does not cogently argue why the fiduciary relationship between husband and wife required Parviz to account for all "unknown" expenditures by clear and convincing evidence when the court only needed to find waste by a preponderance of the evidence. *See Edwards v. Emperor's Garden Rest.*, 122 Nev. 317, 330 n.38, 130 P.3d 1280, 1288 n.38 (2006) (declining to consider issues that are not supported by cogent argument). We note that when Fatemeh's counsel raised a virtually identical argument in briefing to the supreme court in *Kogod*, the court declined to adopt a clear and convincing standard in that case.

community property or funds without the other [spouse's] knowledge, is waste." Yet, this definition of waste is much broader than that adopted by the supreme court in *Kogod*, 135 Nev. at 75-76, 439 P.3d at 406-07 (generally defining waste as a "spouse's use of marital property for a selfish purpose unrelated to the marriage in contemplation of divorce or at a time when the marriage is in serious jeopardy or is undergoing an irretrievable breakdown" (quoting 24 Am. Jur. 2d *Divorce and Separation* § 524 (2018))).

In this case, the district court's overly expansive definition of waste failed to account for *Kogod*'s holding that a husband's "relatively long-standing and regular" expenditures to family members, *which were often made without consulting his wife*, did not constitute waste. *Id.* at 77, 439 P.3d at 408. Likewise, the district court's overly broad conception of waste failed to account for the distinction between waste and a spouse's overconsumption during a marriage, of which the other spouse might not be aware. *Id.* at 78-79, 439 P.3d at 408-09; *see also Putterman*, 113 Nev. at 609, 939 P.2d at 1048-49 ("Almost all marriages involve some disproportion in contribution or consumption of community property. Such retrospective considerations are not and should not be relevant to community property allocation and do not present 'compelling reasons' for an unequal disposition . . . ."). In addition, the district court failed to recognize that consent to make a gift of community property may also be *implied* by the circumstances. *See* NRS 123.230.

We note that family-related expenditures, even when not disclosed or agreed to, are not necessarily inimical to a harmonious marital relationship when viewed in the context of the marital estate. *See, e.g.,* *Kogod*, 135 Nev. at 77, 439 P.3d at 407-08. Arguably, upon entering into a marriage, most couples impliedly consent to provide reasonable support for

one another's immediate family. *Cf.* NRS 123.230 ("Neither spouse may make a gift of community property without the express or implied consent of the other."). Although married couples may disagree about money spent on family members, such gifts standing alone should not be deemed dissipation or waste without examining the context of the expenditures, including consideration of the overall marital estate and implied consent under the facts and circumstances of the case.[9] The existence of implied consent is a question of fact for the district court and should be considered along with other factors, such as the size of the gift (higher value may draw higher scrutiny), the regularity of the gift (routine or long-standing gifts are generally not waste), the timing of the gift (the closer to separation or irreconcilable breakdown, the greater the scrutiny), the purpose of the gift, and how close the recipient of the gift is to the parties.[10]

---

[9]To the extent that the district court found that Parviz wasted community assets by allowing his brother and his brother's wife to live with him without providing any financial contribution after the entry of the Joint Preliminary Injunction (JPI), we conclude that this finding was clearly erroneous. The JPI in this case did not prohibit Parviz from allowing family members to stay with him without paying room and board; therefore, he did not violate it. *See also* EDCR 5.703(a) (explaining that a JPI enjoins the parties from "[t]ransferring, encumbering, concealing, selling, or otherwise disposing of any of the joint, common, or community property of the parties . . . except in the usual course of conduct or for the necessities of life").

[10]In *Kogod*, the supreme court affirmed the district court's finding of waste when a husband gave his father two "non-routine" gifts of $3,600, along with a $50,000 "political campaign contribution," after separating from his wife. 135 Nev. at 77, 439 P.3d at 408. The supreme court considered the size, irregular nature, timing, and purpose of these gifts, along with the identity of the recipient, in assessing waste. *Id.* In this case, the district court similarly found that Parviz wasted funds spent on his adult son after the JPI was entered, but failed to evaluate the size,

Whether a particular expenditure by one spouse constitutes waste does not turn on whether the other spouse had *knowledge* of the expenditure at the time it was made; rather, waste generally requires a finding by the court that the expenditure in question was for a selfish *purpose* that is "unrelated to the marriage in contemplation of divorce or at a time when the marriage is in serious jeopardy or is undergoing an irretrievable breakdown." *Kogod*, 135 Nev. at 75-76, 439 P.3d at 406-07 (quoting 24 Am. Jur. 2d *Divorce and Separation* § 524 (2018)). Thus, in *Kogod*, the supreme court suggested that it might be permissible to shift the burden of proving the absence of waste if one spouse could demonstrate that the "transactions furthered a purpose inimical to the marriage, that [the other spouse] made them to diminish [that spouse's] community share, or even that they were unusually large withdrawals from community accounts." *Id.* at 78, 439 P.3d at 408. But here, the district court made no such finding as to *any* of the transactions at issue before improperly shifting the burden of proof to Parviz.

The decree in this case identified only one specific transaction that allegedly constituted waste,[11] while otherwise finding that large

---

regularity, or purpose of the gifts in its decree. Although gifts given to family after a JPI may be subject to greater scrutiny, under *Kogod*, the district court should still consider these other factors when determining if those funds were wasted.

[11]Although the court identified a December 23, 2013, transfer of $10,000 to "someone by the name of 'Yousfi'" as waste, the only explanation given by the court as to why this transfer constituted waste was that "Fatemeh did not consent to the transfer and had no knowledge of the transfer" and "Parviz did not know who Yousfi was and what the transfer was for." The *purpose* of this expenditure was never established and should be reevaluated on remand.

groupings of unknown checks and cash withdrawals over a seven-year period, in the aggregate, constituted waste simply because those expenditures were unexplained. The district court's vague findings in this case stand in stark contrast to the specific findings of waste in *Lofgren*, where the district court identified discrete expenditures that constituted financial misconduct because of both the *timing* of those expenditures (e.g., after the court issued a preliminary injunction in the parties' divorce action) and the *purpose* of the expenditures (e.g., for a selfish purpose unrelated to the marriage).[12] Likewise, the district court's conclusion in this case that groups of transactions, the majority of which occurred before Fatemeh filed for divorce, must be waste simply because Parviz could not explain them is distinguishable from the "specific and meticulous findings of fact" that justified the waste finding in *Putterman*.[13] Because the decree in this case failed to indicate how *any* of the allegedly wasted funds were actually spent,

[12]In *Lofgren*, the district court found that a husband committed waste when he violated the terms of a preliminary injunction in a divorce action by transferring $100,000 of community funds to his father (although some of the funds were later paid back), transferring $17,000 of community funds for his own personal use, using $11,200 in community funds to improve his personal house, using $10,000 of community funds to furnish his personal house, transferring another $13,000 in community funds to his father, and misappropriating $5,000 of community funds by paying his children without court consent. 112 Nev. at 1284, 926 P.2d at 297-98.

[13]In *Putterman*, the district court awarded a wife a country club membership and a portion of stock in a closely held corporation after making specific findings that the husband charged several thousand dollars on his wife's credit cards after the parties' separation, in addition to lying about his income, and refusing to account for *any* finances over which he had control. 113 Nev. at 609-10, 939 P.2d at 1049.

it could not identify which transactions were made for an improper purpose that would justify a finding of waste.

"[D]eference is not owed to legal error" or findings so conclusory that they mask legal error. *Davis*, 131 Nev. at 450, 352 P.3d at 1142. Here, because the decree improperly shifted the burden of proving the absence of waste to Parviz, and because it also failed to identify any specific transactions that constituted waste or make any findings as to the purpose of those transactions, we are left to speculate whether the unequal distribution to account for waste "was made for appropriate legal reasons." *Id.* at 452, 352 P.3d at 1143. We thus reverse the district court's unequal distribution of community property in the amount of $100,357.50 and remand for a proper evaluation of waste consistent with this opinion.

*The district court abused its discretion by failing to adequately analyze alimony*

Parviz next argues that the district court abused its discretion when it awarded Fatemeh alimony of $5,000 per month for ten years. He contends that the decree failed to properly consider the factors under NRS 125.150(9) because the decree's analysis lacked "a rational nexus" between those factors and the district court's decision and because the decree failed to include adequate facts when addressing each factor.

"Alimony is financial support paid from one spouse to the other whenever justice and equity require it." *Rodriguez v. Rodriguez*, 116 Nev. 993, 999, 13 P.3d 415, 419 (2000); *see also* NRS 125.150(1)(a) (providing that the alimony award must be "just and equitable"). When determining if alimony is just and equitable, a district court must consider the 11 factors listed in NRS 125.150(9). *See generally Devries v. Gallio*, 128 Nev. 706, 712, 290 P.3d 260, 264-65 (2012). These factors are:

(a) The financial condition of each spouse;

(b) The nature and value of the respective property of each spouse;

(c) The contribution of each spouse to any property held by the spouses pursuant to NRS 123.030;

(d) The duration of the marriage;

(e) The income, earning capacity, age and health of each spouse;

(f) The standard of living during the marriage;

(g) The career before the marriage of the spouse who would receive the alimony;

(h) The existence of specialized education or training or the level of marketable skills attained by each spouse during the marriage;

(i) The contribution of either spouse as homemaker;

(j) The award of property granted by the court in the divorce, other than child support and alimony, to the spouse who would receive the alimony; and

(k) The physical and mental condition of each party as it relates to the financial condition, health and ability to work of that spouse.

NRS 125.150(9). Although the district court can consider other relevant factors, it *cannot* consider "the marital fault or misconduct, or lack thereof, of the spouses." *Kogod*, 135 Nev. at 67, 439 P.3d at 401.

Alimony may be awarded "based on the receiving spouse's need and the paying spouse's ability to pay." *Id.* at 68, 439 P.3d at 401. The statutory factors relevant to a needs-based alimony award include NRS 125.150(9)(a), (b), (e), (j), and (k). *Kogod*, 135 Nev. at 69, 439 P.3d at 402. Alternatively, alimony may "be awarded to compensate for economic loss as the result of a marriage and subsequent divorce, particularly one spouse's

loss in standard of living or earning capacity." *Id.* at 70, 439 P.3d at 403. The statutory factors relevant to an award designed to compensate for economic loss include NRS 125.150(9)(d), (e), (f), (g), (h), and (i). *Kogod*, 135 Nev. at 71, 439 P.3d at 404.

In this case, the district court awarded Fatemeh alimony in the amount of $5,000 per month for a period of ten years based on Fatemeh's "need[ ]" and Parviz's "ability to pay." The court determined that Parviz's net income was approximately $13,000 per month, while Fatemeh currently does not have any income. Then, the court determined, "[u]pon a review of Fatemah's FDF . . . she needs $5,000 per month in alimony" and "Parviz has an ability to pay that amount."

Although the district court superficially addressed the factors contained in NRS 125.150(9)(a)-(k) before reaching this conclusion, the court's factual findings were incomplete, unsupported by substantial evidence, and internally inconsistent, and they improperly referenced misconduct by Parviz. Further, the court failed to connect its findings with a determination that alimony was "just and equitable" as either a needs-based award or as an award intended to compensate Fatemeh for economic loss after a 20-year marriage due to a change in her standard of living.

Where factor (a) required the district court to consider *each spouse's* financial condition, the court made no findings as to Parviz and noted only that Fatemeh was "presently unemployed" and "actively looking for employment despite being in severe pain from a recent car accident." When evaluating factor (a), the court did not otherwise discuss the parties' respective financial conditions, which would have "help[ed] the court understand the spouses' financial needs and abilities to pay." *Kogod*, 135 Nev. at 69, 439 P.3d at 402.

Where factor (b) required the district court to consider the nature and value of each spouse's respective property, and factor (j) required the district court to take into consideration the property that Fatemeh would be awarded in the divorce, the court did not assign any monetary values to the parties' property or explain how the court's division of that property would impact either Fatemeh's need for alimony or Parviz's ability to pay that amount.[14] *See id.* at 72, 439 P.3d at 404 (requiring district courts to consider whether the "value of the community property [a spouse] received in the divorce obviated any basis for awarding alimony").

When considering the income, earning capacity, age, and health of each spouse under factor (e), the district court's findings are likewise incomplete and, in addition, are unsupported by substantial evidence. The court noted that Parviz was a scientist for the Las Vegas Valley Water District whose income was publicly available on the Transparent Nevada website. However, Parviz objected at trial when Fatemeh sought to introduce a printout of Parviz's income from the Transparent Nevada website, and that evidence was never admitted. Yet, the court erroneously relied exclusively on this unadmitted evidence from Transparent Nevada to

_____

[14]The decree failed to assign a consistent monetary value to the waste finding, which was necessary in order to adequately consider how the determination would impact Fatemeh's need for alimony or Parviz's ability to pay. For example, the decree states, "Even if the Court finds that all of the waste identified by Fatemeh is accurate, then perhaps Fatemeh will receive around $200,000 for the waste issue." However, later in the same decree, the court found waste in the amount of $100,357.50. In addition, we note the decree was internally contradictory in several instances, and it contained both "findings" that were speculative or argumentative in nature as well as "conclusions" that were inconsistent with those findings. These inconsistencies again demonstrate the dangers inherent in the district court's wholesale adoption of litigant-drafted orders.

calculate Parviz's average income as $189,331 per year, or approximately $13,000 per month. This was an abuse of discretion.[15] *See Burroughs Corp. v. Century Steel, Inc.*, 99 Nev. 464, 470, 664 P.2d 354, 358 (1983) (holding that a district court determination that was based upon an exhibit not admitted into evidence was clearly erroneous).

Relatedly, when evaluating Parviz's ability to pay alimony, the district court determined that Parviz had "grossly exaggerated his expenses" but made no findings as to what his actual expenses were to determine if $5,000 per month was an amount that Parviz could pay. The court indicated that Parviz had "significant resources for the payment of support to Fatemeh" due to the discharge of some of his debt in bankruptcy. But the court also ordered Parviz to sell his home to compensate Fatemeh for awards under the decree because it found that "the only cash available is from the sale of the house." The court's acknowledgment that Parviz was unable to compensate Fatemeh under the decree without selling his home undermines its finding that he had "significant resources" to pay alimony.

When considering Parviz's age and health, in connection with factors (e) and (k) as it related to his ability to work, the district court also made insufficient findings. On the one hand, the court acknowledged Parviz's testimony at trial that "his health is poor, and he has 'stress, anxiety, high blood pressure and suicidal ideation' as a result of this

---

[15]Parviz does not specifically challenge the district court's reliance upon this evidence; however, the error is apparent on the record, and we may "take cognizance of plain error *sua sponte*." *Crow-Spieker # 23 v. Robert L. Helms Constr. & Dev. Co.*, 103 Nev. 1, 3 n.2, 731 P.2d 348, 350 n.2 (1987). In her answering brief, Fatemeh points out that "Parviz's 2015-2019 W-2s were admitted at Trial reflecting his historical income." The district court should have looked to the admitted evidence when calculating Parviz's income.

divorce." Yet, the court inexplicably concluded that Parviz "did not provide any evidence of such allegations of his poor health." *See In re DISH Network Derivative Litig.*, 133 Nev. 438, 445 n.3, 401 P.3d 1081, 1089 n.3 (2017) (noting that "evidence need not be in a particular format to qualify as evidence—testimony is evidence whether it is given in court or a deposition").[16] And while the court noted that Parviz was 59 years old, had already worked at the Las Vegas Valley Water District for 25 years, and was currently working, the court did not address Parviz's ability to *continue working* for the 10-year period of the alimony award, especially when he was nearing retirement age.

For Fatemeh, the district court did not make any findings as to her earning capacity, but instead focused on her current lack of income after finding that she was not, at present, "willfully unemployed." In passing, the court noted that Fatemeh was previously employed as an ultrasound technician, that she earned an average of $32,540 annually between 2017 and 2019, that she had been in an automobile accident in 2018, and that she was actively looking for work. But the court did not consider Fatemeh's likelihood of obtaining employment in the future, nor did it consider how

---

[16]We reject Parviz's argument that the district court's income calculation was incorrect since he "lost his employment because of his poor health." Although Parviz claims to have lost his employment, he did not support this claim with any citation to the record. *See* NRAP 28(e)(1) (requiring every assertion in briefs pertaining to matters in the record to be supported by a cite to the appendix where the matter relied upon is to be found). Moreover, based on our review of the record, it does not appear that Parviz presented the district court with any evidence that he lost his employment *prior to entry* of the divorce decree; thus, the district court cannot have erred by declining to consider this issue at the time the court entered the decree. Parviz had applied for Family Medical Leave, but it is unclear what effect, if any, this had on his earnings.

much she might be able to earn under circumstances where she was actively looking for work.

The district court appears to have determined that because Fatemeh was not willfully unemployed, it did not need to consider her earning capacity when calculating alimony but, instead, could look only to her actual income. Fatemeh takes a similar position on appeal, when she asserts that "[t]he district court did not impute income to Fatemeh because it correctly found that Fatemeh was not willfully unemployed." But regardless of whether Fatemeh was willfully unemployed, the district court was still required to consider her earning *capacity* when evaluating an award of alimony. *See* NRS 125.150(9)(e) (requiring consideration of the "earning capacity" of "each spouse"); *see also Earning Capacity, Black's Law Dictionary* (11th ed. 2019) ("A person's ability or power to earn money, given the person's talent, skills, training, and experience.").

The district court did not consider Fatemeh's ability to earn money in light of her talent, skills, training, and experience. Instead, the court examined Fatemeh's declared monthly expenses, determined that she currently does not have any income, and summarily concluded she had a financial need for ten years of alimony payments of $5,000 per month to cover those expenses. But by failing to consider Fatemeh's own earning capacity, the court could not properly evaluate her ongoing need for alimony in relation to Parviz's ability to pay.[17]

---

[17]To the extent Fatemeh argues on appeal that a $5,000 per month award of alimony was necessary to compensate her for economic losses caused by the dissolution of their 20-year marriage, we note that the district court improperly considered misconduct by Parviz as evidence of her economic losses. Initially, when evaluating the nature and value of Fatemeh's property under factor (b), the court commented that "Fatemeh

COURT OF APPEALS
OF
NEVADA

(O) 1947B

When "the trial court does not indicate in its judgment or decree that it gave adequate consideration" to the appropriate alimony factors, "this [c]ourt shall remand for reconsideration of the issue." *Devries*, 128 Nev. at 712, 290 P.3d at 264 (alteration in original) (quoting *Forrest v. Forrest*, 99 Nev. 602, 606, 668 P.2d 275, 278 (1983)). Even though the district court superficially addressed the 11 factors contained in NRS 125.150(9), it was not enough for the court to simply process this case through the list of statutory factors and announce its ruling. The court's factual findings had to be supported by substantial evidence, and the court needed to explain why those findings supported its alimony award in both

---

has significant debt that she had to incur as a result of Parviz's unreasonable positions, all of which were denied, and his filing of the bankruptcy proceedings which further delayed the case." When analyzing Fatemeh's income and employment under factor (e), the court commented that "Fatemeh has borrowed significant funds to meet her basic needs, and to pay counsel to combat the litany of motions and other proceedings brought by Parviz in bad faith. While Parviz seeks to avoid responsibility for his actions through bankruptcy, Fatemeh should not have to do the same." Finally, when analyzing Fatemeh's contributions as a homemaker under factor (i), the court chastised Parviz for "fail[ing] to acknowledge Fatemeh's contributions toward their marriage" and for "vehemently object[ing] to Fatemeh going to Iran in December 2014 and February 2016 to visit her father when he was sick and in a coma."

Although the court could properly award attorney fees and costs to sanction Parviz for needlessly multiplying the proceedings, it was error for the district court to rely on his alleged misconduct during the divorce as justification for awarding alimony. *See Rodriguez*, 116 Nev. at 998, 13 P.3d at 418 ("[W]hen considering an award of alimony, the court may not consider either party's misconduct or fault."). On remand, the district court should instead consider the economic loss factors set forth in NRS 125.150(9)(d), (e), (f), (g), (h), and (i) when evaluating alimony, including the length of the marriage, the parties' standard of living, and Fatemeh's contributions as a homemaker.

amount and duration. Because the district court abused its discretion in evaluating alimony in this case, we reverse the district court's alimony award and remand for a proper determination of alimony. *See Devries*, 128 Nev. at 711-12, 290 P.3d at 264.

*The district court abused its discretion when it awarded Fatemeh all attorney fees and costs from the inception of litigation, an additional $59,000 that she borrowed to fund the litigation, and $7,450 for translation services*

Parviz contends that several of the decree's other financial awards are legally improper or not based on substantial evidence, including an award of $176,976.99 representing all of Fatemeh's attorney fees and costs from the inception of the case in June 2016 through a pretrial evidentiary hearing, an award of $59,000 to reimburse Fatemeh for money she borrowed to pay for her litigation fees, and an award of $19,565 for expert witness and translator fees.

Parviz first challenges the district court's award granting Fatemeh all of her attorney fees and costs through the pretrial evidentiary hearing. This award was entered in response to Fatemeh's motion for reconsideration of the district court's December 2019 order that the parties were to bear their own fees and costs in connection with Parviz's failed motion for summary judgment and the subsequent evidentiary hearing. However, when the district court granted Fatemeh's motion for reconsideration, it improperly awarded Fatemeh attorney fees and costs that had been the subject of *prior* motions that had already been resolved on the merits and were never challenged. In addition, the court awarded costs even though Fatemeh's motion for reconsideration only requested attorney fees and expert witness fees. While the court could permissibly reconsider its decision not to award attorney fees *in connection with the summary judgment motion and evidentiary hearing*, any additional fees

were outside the scope of the order for which Fatemeh sought reconsideration. Further, it was improper to award costs when Fatemeh did not address them or request them in her motion for reconsideration. We therefore reverse the district court's award of attorney fees and costs in the amount of $176,976.99 and remand for the district court to consider only those fees incurred in connection with the summary judgment motion and evidentiary hearing. When calculating those fees, the court must ensure that any fees that were already addressed in prior court orders are excluded. The court must also consider any fees that Parviz has already paid toward that amount to ensure the attorney fee award is not duplicative.

In addition, the $59,000 award to reimburse Fatemeh for monies she borrowed to fund the litigation was an abuse of discretion. The decree contains no findings or analysis about this award but merely states that "Parviz shall be required to reimburse the money to her." It appears that the award of money borrowed to fund the litigation is duplicative of the other attorney fee awards in the decree. Yet, in the absence of factual findings, this court cannot adequately review the district court's award. *See Robison*, 100 Nev. at 673, 691 P.2d at 455; *see also Roe v. Roe*, 139 Nev., Adv. Op. 21, *33-36, ___ P.3d ___, ___ (Ct. App. July 27, 2023). We therefore reverse this award and, on remand, direct the court to ensure that Fatemeh does not receive double recovery of her attorney fees.

Next, Parviz challenges the award of expert fees. The decree awarded a total of $19,565 in expert fees for three experts, including $7,450 for translation services. NRS 18.005(5) provides for the recovery of fees "in an amount of not more than $1,500 for each witness, unless the court allows a larger fee after determining that the circumstances surrounding the

COURT OF APPEALS
OF
NEVADA

(O) 1947B

expert's testimony were of such necessity as to require the larger fee."[18] "A district court's decision to award more than $1,500 in expert witness fees is reviewed for an abuse of discretion." *Frazier v. Drake*, 131 Nev. 632, 644, 357 P.3d 365, 373 (Ct. App. 2015). A district court abuses it discretion when it fails to provide "an express, careful, and preferably written explanation of the court's analysis of factors pertinent to determining the reasonableness of the requested fees and whether the circumstances surrounding the expert's testimony were of such necessity as to require the larger fee." *Id.* at 650, 357 P.3d at 377 (internal quotation marks omitted). The decree made specific findings to justify the fees for the first two experts but failed to further address the translation fee. Because the decree failed to justify the translation services award,[19] granting Fatemeh this expert fee for translation services was an abuse of discretion.[20]

---

[18]Following the entry of the divorce decree, the Nevada Legislature amended NRS 18.005(5) to authorize awards up to $15,000, rather than $1,500, for each expert witness, which amendment became effective on July 1, 2023. 2023 Nev. Stat., ch. 70, § 1, at ___ (enacting A.B. 76, 82d Leg. (Nev. 2023)). For clarity, we cite to the pre-amendment version of NRS 18.005(5), which was the version in effect when the divorce decree was entered.

[19]Although it is arguable whether the expenses of the translation services qualify as expert fees, in this case the decree explicitly included the translation fee as an expert fee award, and neither party challenged the expert designation on appeal, only the amount of the fee awarded.

[20]Parviz argues on appeal that the expert fee award in the decree failed to account for a preliminary $5,000 expert fee awarded to Fatemeh more than three years before the parties' divorce trial. On remand, similar to the attorney fee award, the district court should review any amounts that Parviz has already paid to ensure the expert fee award is not duplicative. If the court finds that Parviz had already paid toward the expert fee prior to trial, the decree should reduce the expert fee award correspondingly.

*Miscellaneous financial awards and allocations*

Lastly, Parviz challenges a number of miscellaneous financial awards and allocations to Fatemeh and argues they were not supported by factual findings or substantial evidence. Specifically, he challenges an award for interim spousal support arrears, the division of insurance proceeds from Fatemeh's car accident, the unequal allocation of the parties' debt, and the sale of Parviz's residence.

The interim spousal support arrears were supported by substantial evidence, as Fatemeh filed a schedule of arrearages shortly before trial. *See Ogawa*, 125 Nev. at 668, 221 P.3d at 704. The division of insurance proceeds from Fatemeh's car accident was also supported by substantial evidence because Fatemeh testified that Parviz received the full insurance payout. Therefore, we affirm these two awards.

However, the decree does not contain adequate findings to support the unequal distribution of debt, where Parviz was ordered to pay half of Fatemeh's community credit card debt but was deemed solely responsible for his bankruptcy debt. Because the district court failed to state its reasoning for why it made an unequal distribution of the parties' community debt, the court abused its discretion. NRS 125.150(1)(b) (providing that the court must make an equal disposition of community property, unless the court sets forth in writing the reasons for making an unequal disposition); *Lofgren*, 112 Nev. at 1283, 926 P.2d at 297. We reverse these allocations as well and remand for further findings.

The final issue is the sale of Parviz's home. Parviz contends on appeal that the district court violated his due process rights by ordering the forced sale of the home, despite the parties' stipulation to the contrary, without affording him the opportunity to be heard. We disagree.

Initially, the parties stipulated that Parviz would be permitted to keep the marital home and buy out Fatemeh's interest so long as he paid for an appraisal, which Parviz agreed to do. However, in his closing brief after trial, Parviz requested that the district court order the sale of the marital home and split the net proceeds between the parties. Similarly, in her closing brief, Fatemeh also requested the district court order the sale of the home to satisfy Parviz's financial obligations under the decree. Finally, in his rebuttal brief, Parviz repeated his request for the district court to order the sale of the marital home, though he disputed which party should be financially responsible for home maintenance and costs pending the sale.

"The doctrine of 'invited error' embodies the principle that a party will not be heard to complain on appeal of errors which he himself has introduced or provoked the court or the opposite party to commit. It has been held that for the doctrine of invited error to apply it is sufficient that the party who on appeal complains of the error has contributed to it." *Pearson v. Pearson*, 110 Nev. 293, 297, 871 P.2d 343, 345 (1994) (citing 5 Am. Jur. 2d *Appeal and Error* § 713 (1962)).

In this case, Parviz twice requested that the district court order the sale of the marital home, but he then contends on appeal that the district court denied his due process rights when it did, in fact, order the sale of the home. Because Parviz introduced the very error he challenges on appeal, he invited the error and is not entitled to relief. *Pearson*, 110 Nev. at 297, 871 P.2d at 346 (stating that the appellant "may not be heard to complain of the decision which resulted from her own attorney's request").

## CONCLUSION

This case illustrates the importance of both practitioners and courts exercising diligence when submitting and adopting proposed orders;

practitioners should ensure that proposed orders are factually accurate and legally adequate, and courts should exercise due diligence and judgment when reviewing litigant-drafted orders prior to adoption. Although we strongly caution courts against adopting litigant-drafted orders without first engaging in thorough and diligent review, we cannot conclude under these circumstances that adopting a proposed order without modification is itself an abuse of discretion. Rather, the appropriate inquiry is to examine the district court's substantive findings, and in this case, we conclude that the court abused its discretion when making several of the financial awards and orders.

In conclusion, we affirm the financial award for interim spousal support arrears and the distribution of the insurance proceeds from Fatemeh's car accident, which were supported by substantial evidence in the record. We also affirm the decree's order to sell the marital home. However, we reverse and remand the financial awards for alimony, attorney fees, and translation services fees. We also reverse and remand the decree's $59,000 award to reimburse Fatemeh for monies she borrowed to fund the litigation and the unequal distribution of the parties' community property and debts. Insofar as the parties have raised any other arguments that are not specifically addressed in this opinion, we have considered the same and conclude that they either do not present a basis for relief or need not be reached given the disposition of this appeal.[21]

---

[21]We note that Parviz made several arguments that did not include appropriate citations to the record, and therefore, we decline to consider them. *See Allianz Ins. Co. v. Gagnon*, 109 Nev. 990, 997, 860 P.2d 720, 725 (1993) ("This court need not consider the contentions of an appellant where the appellant's opening brief fails to cite to the record on appeal."). We remind counsel that every assertion in briefs regarding matters in the

On remand, the court must reevaluate the financial awards for alimony, attorney fees, and expert fees under the appropriate legal standards as set forth in this opinion.[22] The court must also reevaluate the issue of waste and make particularized findings to identify any compelling reasons to justify the unequal distribution of the parties' community property and debt in accordance with NRS 125.150(1)(b).

_____, J.
Westbrook

We concur:

_____, C.J.
Gibbons

_____, J.
Bulla

---

record shall be supported by a reference to the appendix where the matter relied on is to be found. NRAP 28(e)(1).

[22]As noted earlier, Parviz does not challenge the district court's redistribution of his retirement account. Nevertheless, in light of our disposition, the district court should reevaluate the necessity of using Parviz's share of his retirement account to satisfy his financial obligation to Fatemeh in light of any financial awards the court orders in accordance with this opinion.